# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

THOMAS MODJEWSKI,

    Plaintiff,

  v.           Case No. 15-C-1282

NANCY A. BERRYHILL,

     Defendant.

---

## DECISION AND ORDER

---

  Plaintiff Thomas Modjewski challenges the decision of the Commissioner of Social Security denying him disability benefits. He claims that the administrative law judge (ALJ) who heard the case erred in assessing the weight he accorded to the opinion of his treating physician and in assessing the pace at which he would be able to work. Finding no error and substantial evidence to support the ALJ's decision, I affirm.

## I. Background

  Plaintiff was seriously injured in a roll-over motor vehicle accident in 1999. He sustained fractured ribs, a ruptured lung, bruised liver, broken nose, broken scapula and clavicle, and spinal injuries consisting of a C-6 fracture and a T-7 compression fracture. He was working as a welder at the time of the accident, but has not been employed since. Plaintiff claims that the injuries sustained in the accident resulted in physical and mental impairments that render him disabled.

  This is actually the third time this case has been heard by an ALJ and the second occasion for judicial review. A previous application was denied by a decision issued by ALJ Senander on August

22, 2005. R. 15. Plaintiff did not seek judicial review of that decision, but he filed a second application that was heard by ALJ Joseph Jacobson in October 2008, and denied by written decision dated December 10, 2008. Plaintiff did seek judicial review of that decision, which became final when the Appeals Council denied Plaintiff's request for review. In a decision issued by Judge Randa on October 12, 2011, the Commissioner's decision was reversed and remanded. R. 411–16. The Court held that the ALJ erred in failing to cite any medical evidence to support his finding that Plaintiff's mental impairment did not meet or equal Listing 12.02 and in failing to fully account for the limitations the ALJ found Plaintiff had in concentration, persistence or pace. R. 414–15. The Court also found that the ALJ erred in mischaracterizing a March 2006 functional capacity evaluation on which he relied. R. 415.

On remand, a new hearing was held at which Plaintiff, two medical experts and a vocational expert testified. Plaintiff testified that he currently lives at the home of his mother and father with his wife, who works third shift for Times Printing. R. 330, 333–34. On a typical day, Plaintiff testified that he wakes up at about 5:30 a.m., sits around for awhile, and then picks his wife up from work. R. 333. When he returns home, they make breakfast, and he helps with the dishes. He then more or less sits around and watches television. If the grass needs to be cut, he cuts it using a sit-down mower. Because his parents are elderly, he helps around the house, cleaning and vacuuming. He reads the newspaper on the internet. He goes deer hunting but does not climb to or hunt from a tree stand. He walks less than an eighth of a mile into the woods and sits, stands or leans against a tree. R. 335–37. Although his doctors encourage him to exercise, Plaintiff testified that he can only walk about ten minutes before his back starts aching "real bad." R. 337. The only way he can get relief is to lie down, but even that doesn't take the pain away. He has less trouble sitting than standing.

2

His doctor has given him a prescription for Vicodin which he takes only when he absolutely needs it, which is not every day. R. 338–39. Plaintiff testified that he slept "maybe four or five hours a night," which is the same as when he was working. R. 345.

The record also reflected Plaintiff suffered a heart attack and had stents inserted to relieve blockage in October 2011. He was diagnosed with ongoing coronary artery disease following the incident, but was being treated with medication. Plaintiff testified that, other than occasional shortness of breath, he had fully recovered and his blood pressure was "always perfect." R. 350.

With respect to mental health issues, Plaintiff testified that he had a neuropsychological evaluation in 2008, but had not received any treatment. He testified that he gets frequent headaches that "hurt so bad sometimes I can't concentrate." R. 348. He denied any side effects from his medication. R. 349.

Two medical experts also testified at the hearing. Dr. Malcolm A. Brahms, who is board certified in Orthopaedics, opined after listening to Plaintiff's testimony and based on his review of the entire medical record that Plaintiff was capable of performing light work, should avoid ladders, ropes, and scaffolds, and his range of motion should be limited between his waist and his shoulder, avoiding overhead work, with only occasional kneeling, stooping and crawling. Because of the carpal tunnel symptoms, Dr. Brahms also concluded the fine manipulation should only be done occasionally and not repetitively. R. 377–78.

The second medical expert who testified was Dr. Timothy Lynch, a psychologist, who had likewise reviewed the entire file and listened to Plaintiff's testimony. Dr. Lynch testified that in his opinion, Plaintiff had no severe mental health impairments, and thus there were no limitations to add to his RFC. R. 380–81. In response to questioning by Plaintiff's counsel, Dr. Lynch carefully

3

reviewed the results of the tests administered by Dr. Sarah R. Kortenkamp as part of her neuropsychological evaluation and noted that they were almost in their entirety within normal limits. R. 382–85.

Based on the testimony at the hearing and the entire record, including the medical evidence which will be discussed in more detail below, the ALJ found that Plaintiff had the following severe impairments: disorders of the spine with residual headaches; status post rib fracture; status post head injury; coronary artery disease status post myocardial infarction; carpal tunnel syndrome; and obesity. The ALJ further found that none of Plaintiff's impairments met or medically equaled a listed impairment as described in 20 C.F.R. Part 404, Subpart P, Appendix 1, and that he has the RFC to perform light work that allows him to alternate between sitting and standing at will, requires no more than occasional performance of fine manipulation tasks with his non-dominant left hand, overhead reaching with his left upper extremity, stooping kneeling, crouching, crawling, balancing, stooping, or climbing of ramps and stairs, and no climbing of ladders, ropes, or scaffolding. As an additional limitation due to pain, the ALJ found that Plaintiff was unable to maintain the concentration necessary to perform detailed or complex tasks. Though unable to perform his past work as a welder, the ALJ found that Plaintiff was able to perform other jobs, such as cashier, office helper, or industrial inspector, and thus was not disabled. R. 288–98.

## II. Analysis

In reviewing a decision of an ALJ on a claim for Social Security disability benefits, this court may not reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute its own judgment for that of the Commissioner of Social Security; rather, the court's task is limited to determining whether the ALJ's factual findings are supported by substantial

4

evidence. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.") Despite the deference accorded to the ALJ, however, a reviewing court must not "simply rubber-stamp the Commissioner's decision without a critical review of the evidence." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). The Commissioner's decision cannot stand if the ALJ fails to build a logical bridge from the evidence to his conclusion. *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000). While the ALJ need not provide a "complete written evaluation of every piece of testimony and evidence," *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995), his decision must reflect a fair assessment of evidence and be free of fatal gaps and contradictions. *Johnson v. Apfel*, 189 F.3d 561, 563 (7th Cir. 1989). Still, a reviewing court must "give the opinion a commonsensical reading rather than nitpicking at it." *Id.* at 564.

## A. Treating Source

The bulk of Plaintiff's argument is directed at challenging the ALJ's decision to give little weight to the opinion of Plaintiff's treating physician, Dr. Jennifer George, D.O. The opinion of a treating doctor usually is given controlling weight because a treating source is assumed to be familiar with a claimant's medical issues over time and can provide a unique perspective. *See* 20 C.F.R. § 404.1527(c)(2). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion, *Scott v. Astrue,* 647 F.3d 734, 739 (7th Cir. 2011), and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Beardsley v. Colvin,* 758 F.3d 834, 839 (7th Cir. 2014) (citing 20 C.F.R. § 404.1527(c)(1)) (other citation omitted).

5

Dr. George had seen Plaintiff roughly twice per year for seven years, and had seen him intermittently prior to that. On April 8, 2013, Dr. George filled out a form she received from Plaintiff's lawyer called "Lumbar Spine Work Capacity Questionnaire and Cervical Spine Medical Source Statement." R. 1033. She opined that the Plaintiff's prognosis was "poor" and that he had chronic pain and/or parasthesia. He also had "5/10 pain on a daily basis" and requires frequent position changes. *Id.* At times the pain reached 10 out of 10. In addition, Plaintiff experienced "chronic daily headaches that are 5/10 in nature. When fatigued pain is worse at times 10/10." R. 1034. She concluded that Plaintiff's pain would "frequently" interfere with his attention and concentration; that he could sit 5 minutes and stand 5–10 minutes at a time. Altogether, according to Dr. George, Plaintiff could sit less than two hours and sit/stand also less than two hours in an eight-hour working day. R. 1035–36. She also concluded that Plaintiff must walk around every 10–15 minutes, for a total of 10 minutes (which would mean Plaintiff would be in a nearly constant state of ambulation). R. 1035. In addition, if he were employed, he would need unscheduled breaks of 30–60 minutes. Finally, she concluded that her patient would miss more than four days of work per month, and that "In my opinion, this [patient] is unable to work." R. 1037.

With these limitations, Plaintiff would clearly be considered disabled. The ALJ gave little weight to the opinions of Dr. George, however, and cited several reasons for doing so. R. 295. First, Dr. George had expressed a desire to help Plaintiff get disability benefits, and the ALJ believed this might have clouded her objectivity. For example, as far back as 2003, Dr. George had stated in her treatment notes that "my goal with him is to get him [disability] insurance so that we can get him into a chronic pain management clinic to help him with his chronic pain." R. 226.

6

Plaintiff is correct that a doctor's desire to help a patient prove his claim for disability benefits is not by itself a sufficient reason to discount a treating physician's opinion. Nonetheless, the Seventh Circuit has acknowledged the bias to which treating physicians may be subject:

> We must keep in mind the biases that a treating physician may bring to the disability evaluation. "The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985). Additionally, we have noted that the claimant's regular physician may not appreciate how her patient's case compares to other similar cases, and therefore that a consulting physician's opinion might have the advantages of both impartiality and expertise.

*Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). The fact that Dr. George had said it was her goal to get Plaintiff disability would not by itself constitute a sufficient reason for discounting her opinion. It does suggest, however, when considered with the other reasons offered by the ALJ, an alternative explanation for her pessimistic view of his functional capacity. It was not unreasonable for the ALJ to observe that Dr. George's statement suggested that her opinions "may not be completely objective." R. 295; *see Labonne v. Astrue*, 341 Fed. App'x 220, 224 (7th Cir. 2009) ("But an ALJ may reject a treating physician's opinion over doubts about the physician's impartiality, particularly since treating physicians can be overly sympathetic to their patients' disability claims. . . . We uphold all but the most patently erroneous assessments of a treating physician's bias." (citation omitted)).

The ALJ also discounted Dr. George's opinion because it was vague in that she failed to set forth a function-by-function analysis "and infringes on matters reserved for the Commissioner." R. 295. This was certainly true as to some of Dr. George's opinions. In a letter "to whom it may concern" dated June 17, 2005, for example, Dr. George wrote that Plaintiff was "currently under my care for chronic back pain and cognitive impairment after sustaining a closed head injury eight years

7

ago. When I last saw Tom on March 25, 2005, his condition was unchanged. His condition is stable and his [sic] still unable to work." R. 206. Dr. George likewise expressed her opinion that Plaintiff was "totally disabled from all work" by circling the answer "yes" on a form she signed on March 25, 2005. R. 258. Neither opinion states specific functional limitations to support the conclusion that Plaintiff is completely disabled, nor do they reference any reports or treatment notes containing medical findings of such limitations. It was only in the questionnaire sent to her by Plaintiff's attorney that she completed in April 2013 that Dr. George listed specific functional limitations, but even as to those, it is unclear how she arrived at the limitations she listed. R. 1032–37.

As Plaintiff acknowledges, an ALJ is not bound by even a treating physician's opinion that her patient is disabled and unable to work. The regulations reserve to the Commissioner "the *final* responsibility for deciding residual functional capacity (ability to work—and so whether the applicant is disabled)." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (citing 20 C.F.R. § 404.1527(e)(2)). Of course, the fact that the treating physician intrudes on an issue reserved to the Commissioner is not a reason to disregard the opinion entirely. *Id.* But that is not what the ALJ did here. The ALJ reviewed the actual treatment notes that were completed upon the multiple physical examinations of Plaintiff over the time of his alleged disability and concluded that the physical findings noted in those records did not support the only opinion Dr. George offered that did set out function-by-function limitations.

For example, the ALJ noted that Dr. George cited positive straight leg raising as an objective sign that supported her opinion. R. 1034. Her own and Dr. Listwan's treatment notes, however, indicated that the results for straight leg raising tests for Plaintiff were negative, as were the results for Hoffman's, Romberg, and Skater's testing during examinations. R. 296 (citing R. 225, 230, 748).

The ALJ found Dr. George's opinion that Plaintiff was unable to even sit or stand for more than two hours in a day and would need unscheduled breaks was "not consistent with his performance during objective functional capacity evaluations in July 2005 or February 2011, nor other examination findings documenting full strength, normal range of motion, and an unremarkable gait." R. 296. The ALJ elaborated on these findings earlier in his decision:

> The record fails to fully substantiate the allegations of disabling symptoms. The claimant exhibited normal (5/5) strength and full range of motion in his upper and lower extremities, symmetrical deep tendon reflexes, intact sensation and coordination, the ability to walk with a normal heel-toe gait pattern, on his tiptoes, and heels, stand from a squatted position, and had negative straight leg raise, Hoffman's, Romberg, and Skater's sign/testing during multiple examinations despite his impairments.
>
> Similarly, he displayed normal range of motion and strength in his right upper extremity as well as normal range of motion in his left upper extremity during more recent testing, such that use of his right upper extremity is unrestricted and use of left upper extremity is limited to only occasional overhead reaching (Exhibit 10F-8). Likewise, his grip strength with his right and left hands are within normal ranges during more recent testing, albeit on the lower end of the range in which two thirds of people fall (Id-6). Since his left grip strength is lower than his right, a limitation to occasional fine manipulation is consistent with the record. Notably, he displayed normal hand range of motion and strength bilaterally (Exhibits 3F-16, 10F-8). He also denied problems with fine motor skills during examination at times (Exhibit 9F-4).

R. 292 (citing R. 217, 225, 230, 254, 745, 748, 752, 819, 868, 1031).

These are essentially the same findings Dr. Brahms cited in support of his opinion that Plaintiff was capable of light work with minor limitations. R. 375–77. These are also the kinds of physical findings the SSA's new ruling on evaluating symptoms in disability claims encourages ALJs to consider in using objective medical evidence to evaluate symptoms claimants allege. The new ruling offers by way of example an individual who claims that for the last year pain has limited his or her standing and walking to no more than a few minutes a day. Such an individual, the ruling notes,

9

"would be expected to have some signs of muscle wasting as a result. If no muscle wasting were present, we might not, depending on the other evidence in the record, find the individual's reduced muscle strength on clinical testing to be consistent with the individual's alleged impairment-related symptoms." SSR 16-3p, 2016 WL 1119029, *4 (March 16, 2016). Here, notwithstanding Dr. George's opinion that Plaintiff suffered from debilitating pain that prevented him from standing and sitting more than five or ten minutes at a time and for a total of more than two hours throughout an eight-hour day, Plaintiff generally had normal strength in his extremities and there is no evidence of muscle atrophy noted in the medical record. R. 253.

But these were not the only reasons the ALJ decided to give little weight to Dr. George's opinion. The ALJ noted that while Dr. George asserted that Plaintiff is "unable to concentrate because of headaches (which are noted to improve with medication) or perform simple tasks because of pain," reports show that he had "good attention, cognition, and memory during testing and examination." R. 296 (citing R. 224, 271, 819, 868). This was in part the same evidence Dr. Lynch offered in support of his testimony that Plaintiff did not have any severe mental impairments, concentrating in particular upon the neuropsychological evaluation conducted by Dr. Kortenkamp. R. 380, 381–88 (referencing R. 269–75).

The ALJ also noted that Dr. George's opinions concerning Plaintiff's functional capacity were also inconsistent with the functional capacity evaluations completed by two different therapists in July 2005 and February 2011. R. 170–74, 783–93. The conclusion from the July 2005 two-day functional capacities evaluation was that Plaintiff "is capable of performing work at the Medium level, as defined by the U.S. Department of Labor in the Dictionary of Occupational Titles. Based on this evaluation, the client is capable of sustaining the Medium level of work for an 8-hour day." R. 207.

10

The February 2011 evaluation indicated Plaintiff could lift or carry 25 pounds rarely, 20 pounds occasionally, and 10 pounds frequently, based on two days of testing. Dr. George, on the other hand, opined, without any reference to any test or evidence, that Plaintiff could lift 10 pounds occasionally but never any greater weight. R. 787, 1036. The most recent evaluation also indicated Plaintiff could stand and walk occasionally and noted no limitations on sitting. R. 788. Dr. George said Plaintiff could sit only 5 minutes at a time, stand only 5 to 10 minutes, and do each no more than two hours in an eight-hour day, again without reference to any test or other evidence. R. 1035. Dr. George also offered the opinion that Plaintiff would miss more than four days of work per month because of his impairments, again without any explanation of how she arrived at that conclusion. The ALJ noted this assertion was "pure speculation, not consistent with his performance during functional capacity evaluation (which showed consistent performance across multiple days of testing), and outside [Dr. George's] area of expertise, as she is not a vocational expert and therefore does not know the requirements of all the jobs in the state economy." R. 296.

Plaintiff disputes the ALJ's finding that the July 2005 and February 2011 functional capacity evaluations conflict with Dr. George's opinions regarding his ability to sit or stand. He contends that "the FCE recommended no sitting or standing for work contrary to the ALJ's finding." Pl.'s Br. at 26. The citation Plaintiff offers, however, is to a March 2006 functional capacities evaluation, which the ALJ found unpersuasive for several reasons. R. 293 (referencing R. 247–56). First, he noted that the March 2006 evaluation was conducted solely for purposes of supporting Plaintiff's application for disability benefits at the request and expense of Plaintiff's mother, R. 246, and second, was inconsistent with the findings made on physical examination as well as the other two functional capacity evaluations. R. 293. In particular, the ALJ noted that the March 2006 evaluation was

11

inconsistent with the July 2005 evaluation which, as already noted, concluded that Plaintiff could perform work at the medium exertional level. The ALJ reasonably concluded that Plaintiff's functional capacity was not likely to have decreased from medium to less than sedentary in ten months absent further explanation. R. 293.

It is true that the ALJ misread the February 2011 functional capacities evaluation to say that Plaintiff had normal range of motion in his cervical spine. As the Commissioner notes, however, the point remains that Dr. George's opinion is not supported by the most recent functional capacity evaluation, since the report of that evaluation does show greater range of motion of the cervical spine than Dr. George found. The February 2011 evaluation showed 45% left and right rotation and 20% flexion, whereas Dr. George listed 15% left rotation, 20% right rotation, and 10% flexion. R. 789, 1034. More importantly, the balance of Plaintiff's musculoskeletal system was found to be within normal limits, as Dr. Brahms observed, and there is no evidence that the decreased range of motion in the cervical spine resulted in limitations beyond those included in the RFC.

Finally, the ALJ noted that Plaintiff "admitted better sitting and standing capacities than Dr. George asserts and the fact that he drives, traveled to the Philippines, and performs household chores suggest better functioning." R. 296 (citing R. 170–74, 863, and hearing testimony). To be sure, the fact that Plaintiff makes meals, does dishes, some light housework, mows the lawn on a riding mower, traveled to the Philippines, and goes deer hunting (walking about an eighth of a mile and leaning/sitting against a tree), R. 336–37, does not conclusively prove that Plaintiff can work an eight-hour day. It does suggest that he is not as limited as he claims, however, and that is a sufficient reason to doubt his overall credibility. *See Pepper v. Colvin*, 712 F.3d 351, 368–69 (7th Cir. 2013) ("The ALJ concluded that, taken together, the amount of daily activities Pepper performed, the level

12

of exertion necessary to engage in those types of activities, and the numerous notations in Pepper's medical records regarding her ability to engage in activities of daily living undermined Pepper's credibility when describing her subjective complaints of pain and disability."). The ALJ need not find evidence in the record to conclusively refute every one of a claimant's asserted limitations in order to reject his testimony. If that were the test, it would be almost impossible to find any claimant incredible. It would be likewise almost impossible to reject the medical opinions that rest upon the claimant's complaints.

Notwithstanding the ALJ's careful and thorough explanation for why he accorded Dr. George's opinion little weight, Plaintiff argues that the ALJ erred in failing to explicitly consider the factors the regulations list as relevant to determining the weight of such opinion evidence when it is not controlling. In weighing medical opinions, the ALJ should explicitly consider the: (1) length, nature, and extent of the treatment relationship; (2) frequency of examination; (3) physician's specialty; (4) types of tests performed; and (5) consistency and supportability of the physician's opinion. *Scott v. Astrue,* 647 F.3d 734, 740 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)). The ALJ fully and carefully explained the reasons for giving little weight to Dr. George's opinion. Without explicitly citing them, the ALJ considered each of the factors he was required to consider in assessing the weight given the Dr. George's opinion. He clearly noted the treating relationship Dr. George had with Plaintiff and the records cited establish the longstanding nature of that relationship. Although he did not explicitly note Dr. George's specialty, this cannot reasonably be considered error since she is apparently a family practice physician, in contrast to Dr. Brahms, the orthopedic physician who testified at the hearing. The ALJ explicitly referred to the types of tests and examinations performed and the consistency and supportability of Dr. George's opinions. An ALJ must only

13

"minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). The ALJ more than met that standard here.

## B. Work Pace

Plaintiff also contends that the ALJ erred in assessing his capacity to maintain adequate pace in a work setting. Sarah R. Kortenkamp, Ph.D., a neuropsychiatrist, performed a neuropsychological evaluation of Plaintiff in May 2008 and found that he showed "some reduced processing speed, attentional difficulties, and low average memory that could be a change from baseline." Pl.'s Br. at 27 (quoting R. 274). This led her to suspect that "he did have a significant closed head injury that is attributing somewhat to his performances today in terms of reduced processing speed and fluctuations in attention." R. 274–75. Dr. Kortenkamp indicated that "uncontrolled pain is likely exacerbating attentional difficulties and memory difficulties." R. 275. Given these findings, Dr. Kortenkamp concluded that if Plaintiff returned to work as a welder and pushed past his physical limits, she suspected that "his cognitive performances would drop considerably given the increase in pain he would experience." R. 275. Finally, Plaintiff emphasizes Dr. Kortenkamp's statement that *"I would expect further deterioration of processing speed and attention with increases in pain that would come with the physical requirements of his job."* Pl.'s Br. at 28 (quoting R. 275 (italics added by Plaintiff)). Form these quotations from Dr. Kortenkamp's report, Plaintiff argues that he had "significant cognitive impairments of attention, concentration, persistence and pace which increased with pain and greater physical exertion," which would mean that he would have "a diminished work pace due to processing speed and attention." Pl.'s Br. at 28. In light of this evidence, Plaintiff argues

14

that the ALJ erred in finding that he did not have a severe mental impairment and in failing to incorporate a limitation on pace in his RFC.

Read in context, the quoted sections of Dr. Kortenkamp's report concerned whether he could return to work as a welder, not whether he could return to work at all. It was in the event he returned to his job as a welder, that Dr. Kortenkamp suspected that the uncontrolled pain brought on by exceeding his physical limits would cause his cognitive performance to decrease considerably from the increase in pain he would experience. R. 275. Given the fact that the ALJ found that Plaintiff was not physically capable of performing his previous job as a welder, Plaintiff's emphasis on this part of Dr. Kortenkamp's report is curious.

More importantly, it is not true that Dr. Kortenkamp said that Plaintiff has a severe mental impairment. She did say he sustained a significant closed head injury in the 1999 accident and though she attributed some reductions in processing speed, attentional difficulties, and low average memory to his injury, she concluded from the battery of tests she had administered that "taken together, there does not appear to be any overall cognitive decline as a result of his head injury." R. 274. It was from his own review of the results of the tests administered by Dr. Kortenkamp and the rest of the record that Dr. Lynch concluded that Plaintiff had no severe mental impairment. R. 380. With respect to processing speed, Dr. Lynch noted that according to Dr. Kortenkamp, Plaintiff had "no difficulty staying on track through the entire interview." R. 382 (quoting R. 271). Dr. Lynch also thought it significant that Plaintiff had no difficulty understanding the test instructions, which he observed "was not a passing minor screening; this was a very thorough neuropsychological assessment." R. 382. Dr. Lynch then proceeded to go through the test results one-by-one, explaining why they did not support a finding of a severe mental impairment. R. 383–85.

15

Given his expertise, which was not disputed, and his detailed explanation of the data, the ALJ did not error in relying upon Dr. Lynch for his finding that Plaintiff did not have a severe mental impairment. Instead, the ALJ reasonably addressed Plaintiff's cognitive issues in the RFC as a physical limitation due to pain, as opposed to a mental disorder. Indeed, Plaintiff himself generally attributed his cognitive complaints to his pain level, not to his head injury. R. 269. By limiting Plaintiff to a reduced version of light work not involving detailed or complex tasks, the ALJ provided an RFC that would minimize the kind of pain that Dr. Kortenkamp suspected would adversely impact his cognitive performance.

Plaintiff's assertion that the ALJ erred in failing to account for his moderate limitations in pace appears little more than an effort to fit his case under the holding of *Yurt v. Colvin*, 758 F.3d 850 (7th Cir. 2014), and similar cases that have bedeviled ALJs confronted with mental impairments causing moderate limitations in concentration, persistence and pace. *See also Varga v. Colvin*, 794 F.3d 809, 813–14 (7th Cir. 2015); *O'Connor–Spinner*, 627 F.3d 614, 619 (7th Cir. 2010); *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009). Although counsel for Plaintiff had an interesting discussion with the ALJ at the hearing about this particular issue, R. 351–54, that issue is not relevant here for the simple reason that the ALJ did not find Plaintiff suffered from a severe mental impairment that caused moderate limitations in his ability to maintain a reasonable pace at work. Having found that Plaintiff did not have a severe mental impairment, the ALJ did not err in failing to include in the RFC a limitation on pace.

## III. Conclusion

For the reasons given above, the decision of the Commissioner is affirmed. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** this 14th day of March, 2017 in Green Bay, Wisconsin.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court